***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Gregory, along with the briefs and arguments on appeal. The appealing party has not shown good ground to receive further evidence or to amend the prior Opinion and Award. Accordingly, the Full Commission adopts and affirms the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing on 20 July 2000 as:
 STIPULATIONS
1. All parties are properly before the Commission and the Commission has jurisdiction of the parties and of the subject matter.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. On August 7, 1998, the date of the injury, this cause was subject to the Act.
4. On August 7, 1998, an employment relationship existed between plaintiff and defendant-employer.
5. On August 7, 1998, Key Risk Management Services was the carrier on the risk.
6. Plaintiff's injury, which is the subject of this cause, is a back injury that resulted from an electrical shock and fall from a ladder.
7. Plaintiff's average weekly wage at the time of the injury was $540.00 with a weekly compensation rate of $360.02.
8. Plaintiff is seeking compensation for lifetime medical expenses, medical treatment for pain and depression, medical treatment for sexual dysfunction related to his workers' compensation injury, and temporary total disability compensation due to change of condition.
9. At the hearing, the parties stipulated the contents of the Industrial Commission file into evidence.
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. Plaintiff is a forty-seven year old with an eighth grade education whose reading and writing skills are limited. Plaintiff has worked for the defendant-employer for ten years. Prior to working for defendant-employer, plaintiff worked for a building contractor, George Jenkins, as a carpenter performing basic carpentry work and framing for approximately ten years. Prior to working for George Jenkins, plaintiff worked for Burlington Industries as a finisher for about four years and also worked at several textile mills.
2. Prior to his injury by accident, plaintiff suffered from anxiety and depression but was capable of working. Furthermore, plaintiff was a smoker and smoked up to a pack per day in 1996 and continued to smoke until at least 1997.
3. On August 7, 1998, plaintiff sustained an injury by accident while working for defendant-employer at a school in South Carolina on a renovation project. Plaintiff was on a ladder standing up between the ceiling grids installing a temporary light when he accidentally touched a live wire and was electrocuted. Plaintiff then fell from the ladder and landed on the concrete floor. Plaintiff was immediately transported to Gaston Memorial Hospital where an x-ray and an MRI revealed that the impact of the fall caused a compression fracture of his L-1 vertebral body. Plaintiff was evaluated by Dr. Greenberg, a neurosurgeon, who found a normal neurologic evaluation but found that the fracture was significant enough to warrant stabilization with a fusion to prevent bone fragments from injuring nerves.
4. Defendants accepted plaintiff's August 7, 1998 injury by accident as compensable on an I.C. Form 60.
5. On August 13, 1998, Dr. Greenberg performed surgery to fuse plaintiff's vertebra from T-12 through L-2, using bone from plaintiff's ribs to create a graft which was then stabilized with a titanium cage and a metal plate fixed with screws. Plaintiff was discharged from the hospital after five days but remained out of work due to his condition.
6. Dr. Greenberg saw plaintiff on August 28, 1998 and September 28, 1998. Plaintiff was treated with Percocet and his x-rays looked normal. On October 26, 1998, plaintiff continued to have pain but other than difficulties with one nerve root, plaintiff's neurologic exam was normal. Plaintiff experienced intercostal neuralgia or pain along the rib. Plaintiff was given Nortriptyline and was referred to the pain center for a nerve block.
7. On November 25, 1998, plaintiff was again seen by Dr. Greenberg at which time plaintiff's pain treatment had been assumed by Dr. Zutkaitis at the pain center. Plaintiff began receiving injections regularly for his pain. Plaintiff was unable to work at this time due to the severity of his pain. Dr. Greenberg felt that because of the persistence of plaintiff's pain he should retire and get social security disability. Furthermore, according to Dr. Greenberg, plaintiff's pain was causing him to suffer depression or an increase in his pre-existing depression.
8. Dr. Greenberg did not see plaintiff again until February 1999 at which time plaintiff continued to suffer from chronic pain. While the reconstruction of plaintiff's spine was successful and he had normal neurologic function, he continued with chronic pain and treatment at the pain center. Due to plaintiff's treatment at the pain center, Dr. Greenberg suggested that plaintiff not return until May 5, 1999. At that time plaintiff was taking Prozac, which helped his pain. Plaintiff was also taking Percocet for pain. Plaintiff remained unable to return to his former employment due to his injury. Although Dr. Greenberg did not feel that plaintiff had reached maximum medical improvement, he nevertheless provided plaintiff with a rating of a ten percent permanent partial impairment to his back due to the fact that plaintiff's care would be followed by the pain center. The pain center was not provided the job description for review.
9. On June 14, 1999, Joanne Johnson, a case manager, provided Dr. Greenberg with a job description of a desk job for review. While Dr. Greenberg felt that plaintiff could physically perform the job, he was concerned that plaintiff's pain might prevent him from sitting at a desk and that plaintiff's reading ability could be a problem. Plaintiff was being treated by the pain center at this time and did not return to Dr. Greenberg until over a year later.
10. Plaintiff continued to suffer chronic pain but due to medication and injections was able to return to lighter work on November 1, 1999, when he began working in the warehouse for defendant-employer at a desk job. Plaintiff's duties included taking and placing orders for supplies, keeping the tools in working order and making sure that the employees had the supplies and tools they needed for jobs. Plaintiff had an office with a desk in a former supply closet. Plaintiff was able to perform the basic job duties due only to his pain and depression being controlled and was paid his former wages. John Foster who did not directly supervise plaintiff but supervised plaintiff's direct supervisor and approximately 60 to 70 employees observed plaintiff on occasion and felt that plaintiff was capable of performing the job.
11. Plaintiff continued to receive regular treatment including injections at the pain center under the care of Dr. Zukaitis and Dr. Matthew. Dr. Matthew first saw plaintiff in December of 1999 at which time he was taking Percocet, Ambien, Prozac and Neurontin. Plaintiff returned to Dr. Matthew on February 23, 2000 at which time due to plaintiff's continued use of Percocet, Dr. Matthew prescribed Oxycontin to give long-term relief but continued Percocet for break-through pain. In March 2000, plaintiff was again seen for chronic pain and Dr. Matthew attempted to switch plaintiff's medication from Oxycontin to Methadone which attempt was unsuccessful due to excessive sedation. Plaintiff showed hopelessness and complained of insomnia, both signs of depression. On October 26, 2000, plaintiff was again seen and a trigger point injection was given which provided plaintiff relief for approximately one week. Plaintiff thereafter continued with injections in November and December 2000 and the relief obtained was of a longer duration. Plaintiff returned for additional injections in January, February and March 2001 but due to concerns of pneumothorax, Dr. Matthew recommended chemodenervation to be performed by Dr. Gore.
12. Sometime between late May and early July 2001, plaintiff injured his lumbar spine at L5-S1 when he fell at home and sustained a herniated disc. The level of this injury is approximately 10 to 12 inches lower than the level of plaintiff's August 1998 injury. As a result, plaintiff again returned to Dr. Greenberg on August 27, 2001. Plaintiff reported new symptoms including severe left back and left leg pain and increasing weakness in his leg and numbness and had an abnormal neurologic exam and a positive straight leg raise test. However, plaintiff's chronic pain from his original 1998 injury continued and he continued to receive the same pain medication and injections and treatment at the pain center. The injections performed continued to be at the location just beneath plaintiff's scar from his 1998 surgery and the only evidence to the contrary is a typographical error that was later corrected.
13. As a result of plaintiff's 2001 injury, Dr. Greenberg performed surgery on August 31, 2001 to remove the abnormal portion of the disc using a microscope and a very small incision. The surgery was successful and plaintiff returned to work immediately after the surgery, missing little or no time from work. Plaintiff underwent physical therapy and returned to Dr. Greenberg on October 9, 2001 with very little complaints other than some spasms in the left ankle at night. Thereafter, on November 27, 2001, plaintiff continued to receive physical therapy and returned to Dr. Greenberg with some weakness and numbness in the left foot as well as neurologic deficits but his pain with respect to the second injury had resolved to a great degree. Plaintiff was working at the time and expressed to Dr. Greenberg that he felt working was making his pain worse. Plaintiff was taking Prozac for depression and Neurontin, OxyContin 20 and Percocet for pain. Plaintiff did not return to Dr. Greenberg after November 27, 2001 at which time Dr. Greenberg felt any remaining pain was attributable to the 1998 original injury.
14. Dr. Greenberg described plaintiff's second surgery as "fairly innocuous" with respect to plaintiff's overall condition. Plaintiff, whose condition had been somewhat stabilized at the pain center, had been regularly taking Oxycontin, Percocet, Prozac and Neurontin since prior to his 2001 fall. Therefore, plaintiff's fall at home and second surgery did not change his course of prescription treatment and Dr. Greenberg stated that it would be difficult to discern if plaintiff's pain actually increased as a result of the 2001 fall and in particular since plaintiff's measurable amount of medication was relatively the same and since plaintiff had received injections for pain prior to the 2001 fall. Furthermore, Dr. Greenberg did not give plaintiff any additional work restrictions as a result of the 2001 fall.
15. Plaintiff contends that his fall in the summer of 2001 was caused by dizziness and instability related to his original work-related injury of August 1998 or medications prescribed as a result. However, based on Dr. Greenberg's lack of opinion on a relationship between the two, Dr. Greenberg's finding of no neurologic deficits, and all of the medical records of evidence, which fail to record any such actual side effects from plaintiff's medications, and finally the fact that Dr. Matthew vouched for plaintiff's driving ability, the greater weight of the evidence fails to demonstrate that plaintiff's fall at home or resulting surgery or any disability between the time of the fall at home and November 27, 2001 is related to his original 1998 injury by accident.
16. Plaintiff continued to work for defendant-employer despite his chronic pain but began to have more difficulty with pain, depression and trouble sleeping in the autumn and winter of 2001. Plaintiff's increased problems were due in part to his inability to receive medications and treatment for his pain and depression resulting from his 1998 injury beginning in December 2001 when defendants denied plaintiff's injection and medication treatment for pain and plaintiff suffered from withdrawals and increased depression and pain. Due to these factors, plaintiff was often late to work or had to leave early. As a result defendant-employer terminated plaintiff for tardiness. Mr. Recore, owner of defendant-employer then offered plaintiff the option of coming in and making a couple of hundred dollars a week for doing some work but did not discuss the job in any detail. Plaintiff indicated that Mr. Recore has a disabled brother-in-law who does some work as he pleases. Plaintiff has essentially been out of work since January 16, 2002 but has performed some side jobs for a former employer with the help of his brother earning up to $300 or $400 per month.
17. On April 11, 2000, over a year and a half after his work-related injury by accident and surgery, plaintiff presented to his primary care physician, Dr. Thomas complaining of erectile dysfunction. Plaintiff had never complained of this problem to Dr. Greenberg who would not have indicated a normal neurologic exam if there were erectile dysfunction present. According to plaintiff about eight or nine months after his accident, he began to notice sexual dysfunction and was embarrassed hoping that it would subside on its own. However, when it did not subside, he talked to his doctor, Dr. Thomas in April of 2000 who prescribed Viagra. Dr. Thomas felt that plaintiff's Prozac could cause plaintiff's condition. However, eventually it was determined by a specialist that plaintiff's sexual dysfunction was not caused by Prozac.
18. On July 23, 2001, plaintiff was evaluated by Dr. Dominick Carbone, a urologist, at Wake Forest University who specializes in impotence. Plaintiff underwent several tests including blood tests. The results revealed that plaintiff's problem was primarily caused by insufficient arterial flow and secondarily caused by low testosterone. Dr. Carbone prescribed a course of injections. Dr. Carbone did not feel that plaintiff's problems were neurogenic or caused by medication side effects. As the condition was not neurogenic, it was not likely caused by either surgery. Due to plaintiff's young age and apparent lack of history of risk factors for arterial disease, Dr. Carbone by process of elimination felt that the remaining cause was the electrocution. However, Dr. Carbone failed to perform lipid screening on plaintiff who had borderline HDL in 1996 and Dr. Carbone was unaware of plaintiff's history of smoking. Therefore, the greater weight of the evidence fails to demonstrate that plaintiff's sexual dysfunction is related to his 1998 work related injury or the resulting surgery, medications or depression.
19. Since January 16, 2002, plaintiff has been without income except for several odd jobs that he has managed to do for his former employer George Jenkins. He performs small light jobs two to three hours a day for a couple of days a week but no more than 15 hours a week. He does not work every week, but just when he feels he can and there is work available. His tasks include assisting with some renovation projects or going to pick up supplies. These odd jobs are not indicative of capacity to earn wages in competitive employment.
20. Plaintiff suffers from depression, which causes him to have trouble sleeping and dealing his pain. While plaintiff suffered from pre-existing depression, the greater weight of the evidence of record demonstrates that plaintiff's depression was aggravated by plaintiff's August 7, 1998 injury by accident and resulting pain. All of plaintiff's physicians are of the opinion that chronic pain can cause or aggravate depression. Plaintiff is in need of treatment and medication for his depression in order to provide relief and lessen plaintiff's period of disability.
21. Plaintiff is currently unable to work because of his continuing relentless pain condition caused by the original 1998 injury. It is unclear from the record whether plaintiff reached maximum medical improvement prior to January 2002. Dr. Greenberg did not feel that plaintiff was at maximum medical improvement even though he provided a rating and the pain center doctors did not give an opinion on maximum medical improvement. However, Drs. Greenberg, Matthew, and Thomas all are of the opinion that plaintiff's pain condition, which resulted in his termination stems directly from the original injury on August 7, 1998. Dr. Matthew from the Pain Center stated that plaintiff's injury caused him to have chronic pain. Dr. Greenberg stated that the original injury had the potential to cause the pain plaintiff described and that his pain was reasonable and believable for his injury. Dr. Thomas concurred with Dr. Greenberg's assessment.
22. Dr. Matthew, plaintiff's current treating physician, believes that plaintiff is unable to perform "any type of sustained activity" because of his pain. In addition, Dr. Greenberg stated that plaintiff's pain prevents him from performing a 40-hour a week job. Dr. Thomas noted that plaintiff' pain was increasing in 2001 and that he would not be able to return to his pre-injury work.
23. Although there is evidence that plaintiff is able occasionally to perform some light, part time work, plaintiff testified that he can only sustain that activity for a short period of time and that he does not work consistently. Plaintiff's part time work is not evidence that he can maintain full time work in the market place. The greater weight of the medical and lay evidence demonstrates that plaintiff is unable at this time to earn wages on any sustained basis. Furthermore, although it is unclear whether plaintiff reached maximum medical improvement, his condition has substantially changed for the worse based on increased pain and depression beginning around December 2001. Furthermore, although plaintiff retained some working capacity during the more than two-year period he worked between November 1999 and January 2002, Dr. Greenberg was not confident in plaintiff's ability to work, which was only based on the fact that his pain was controlled to an extent during that period to allow plaintiff to perform some work.
24. Plaintiff's testimony regarding his pain is accepted as credible and is consistent with the greater weight of the medical evidence of record. After his lower back condition resulting from the 2001 fall had healed, plaintiff's chronic pain continued to relate to his 1998 injury. Plaintiff's subsequent disability beginning January 2002 and continued need for medical treatment was not caused by the second fall but rather it is related to plaintiff's original injury by accident of August 7, 1998. Furthermore, plaintiff's conditions of pain and depression related to his 1998 injury increased when he was unable to obtain medically necessary injections and pain medication in December 2001 ultimately resulting in his January 2002 termination.
25. While the pain medications and injections plaintiff received subsequent to his 2001 fall may have been beneficial to any pain from that fall and surgery, the medications and injections continued to be reasonably necessary to effect a cure or provide relief or lessen the period of disability related to plaintiff's 1998 injury and resulting pain and depression.
26. There is a substantial likelihood that plaintiff will continue to need future medical treatment for an indefinite period of time for his chronic pain condition.
27. Plaintiff was paid workers' compensation disability benefits pursuant to the Form 60 from the date of his 1998 accident until October 31, 1999 when he returned to work.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff suffered an injury by accident on August 7, 1998, which arose out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's fall at home, which occurred sometime between May and July 2001 is not a result of his original 1998 injury by accident or any dizziness related thereto. Therefore, plaintiff is not entitled to payment by defendants for the August 31, 2001 surgery or any disability prior to November 27, 2001 due to that surgery. N.C. Gen. Stat. § 97-2(6).
3. Plaintiff did not reach maximum medical improvement. However, even if he did reach maximum medical improvement, his condition has substantially changed for the worse as a result of his increased pain and depression and subsequent termination from his employment. Therefore, as a result of the 1998 injury by accident to his back, plaintiff has not been able to earn the same or greater wages beginning January 16, 2002 and is entitled to temporary total disability compensation from January 16, 2002 until such time as he is able to return to work at his former wages or until further order of the Commission. N.C. Gen. Stat. §§ 97-31; 97-29.
4. Plaintiff is entitled to payment for all reasonably necessary medical treatment related to his compensable injury by accident for so long as such treatment tends to effect relief, provide a cure or lessen the period of disability including all injections which have been received and all prescriptions for pain and depression. However, plaintiff is not entitled to receive medical compensation for the treatment of his erectile dysfunction or for the August 31, 2001 surgery including any appointments with Dr. Greenberg which deal only with the lower lumbar condition such as pre-op and post-op evaluation and treatment. N.C. Gen. Stat. §§ 97-2(19); 97-25; 97-25.1.
5. Defendants are entitled to a credit for the wages paid plaintiff for the work he did doing odd jobs for his former employer subsequent to January 16, 2002.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendants shall pay plaintiff temporary total disability benefits in the amount of $360.02 per week beginning January 16, 2002 and continuing until such time as he returns to work or further order of the Commission, subject to the credit for wages plaintiff earned doing odd jobs subsequent to January 16, 2002. Any benefits which have accrued to date shall be paid to plaintiff in a lump sum, subject to the provisions of Paragraph 3 of this Award.
2. Defendants shall pay for all reasonably necessary medical treatment related to his compensable injury by accident for so long as such treatment tends to effect relief, provide a cure or lessen the period of disability including all injections which have been received and all prescriptions for pain and depression.
3. A reasonable attorney's fee of twenty-five (25%) percent of compensation due plaintiff under Paragraph 1 of this AWARD is approved for plaintiff's counsel and shall be paid as follows: twenty-five (25%) percent of the sum due plaintiff under Paragraph 1 of this AWARD shall be deducted from that sum and paid directly to plaintiff's counsel. In regards to future compensation, plaintiff's counsel shall receive every fourth check.
4. An expert witness fee for Dr. Carbone is hereby awarded in the amount of $300.00.
5. Defendants shall pay the costs including deposition fees if not already paid.
6. Each side shall pay its own costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/____________________ THOMAS JEFFERSON BOLCH COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN